Good afternoon, Your Honors. I will not argue that you should reverse this case because of the judge involved. In fact, I have tremendous respect for this judge, but I think it's very clear that Judge Stotler, from the beginning of this case, made a determination in her own mind, and that is that the numbers that were on the table of forfeiture values, these guaranteed numbers, were too high. Well, I mean, on the face of it, it's just, I mean, not to be facetious, if I could have been offered an insurance investment like this, you could have put the money in and sat back and retired. How do you square the calculations that talk about a 6% or 8.3 for one point and then dropping to 6 and then having a range of 6 to 8.3%? I mean, that's just, it doesn't compute. It basically, as I understand your argument, will you ignore that part of the policy, jump to the schedule, and say that essentially it was a policy that guaranteed a minimum amount of interest to generate those returns so that it jumps to $800,000 in year 12, not to mention the millions in the farther out years? How does that square? I'm not saying, Your Honor, that it's unreasonable to look at these numbers and say they're very high. What I'm saying is that a court cannot do this. I was taught in my first week of law school that if you have a con you never look at the sufficiency of consideration. If I say I will mow your lawn for a million dollars, the court cannot later say a million dollars was too much, you can't enforce this contract. Well, that's not what they're saying. The second day of contracts also said that you look to the intent of the parties and was there a meeting of the minds. And you're asking us to say that this case turns, not to overbear on it, but that your case depends on ER 18, the table of non-forfeiture values, being the guaranteed contract, and that you ignore what says on the prior page about guaranteed interest rate. And that it's not a failure. What's the failure of consideration? I want to say one thing and then I'll respond to your question. That's OK. The one thing is we're not here to determine the reasonableness of this. We're here to determine whether the statute of limitations was blown. And I think that's really well, that's not the only question. I think we are, too. Well, let me get back to the question. We're not really. It may be that you could prevail on the statute of limitations issue and we could uphold the district court's decision on the alternative ground. Your Honor, in the memorandum, in the minute order, that's the sole ground upon which Judge Stotler. That's right. What I'm saying is we're not limited to determining the case on the basis of the ground on which the district court did. I think it is to know. If we can affirm the results on an alternative ground, a different ground than the district court. I understand. Then let me respond to Judge Fischer's question. The fact, Your Honor, is as I pointed out to the lower court and to the claims adjusters on this case in deposition, they all misread the policy. The position that the carrier took on this was that it's very clear in the policy. First of all, the policy is not clear. We're talking about an elderly gentleman who's never been to college. I'm not sure if he's finished high school. He's not sophisticated. I'm not sure if he's ever read an insurance policy before. I think the deposition testimony was that it wasn't. Trying to figure this out. I will tell you after 21 years of experience. They took his deposition? Yes, they did, Your Honor. I see. Thank you. After 21 years of experience doing this and having started out in insurance defense doing complicated coverage work, I will tell you that I do not understand this policy. And I don't think that North American understands this policy either, because when key executives from North American were in deposition, and I talked to them about this policy, they thought that it was a range of what he got. And it's not. That's a range of the minimum. 6 to 8.3 is the minimum. The only thing this policy says about what you'll get, there are two things it says. It says you will not get less than a range of 6 to 8.30. Why is that both a minimum and max? That's not a minimum and max, Your Honor. I think if you look at the policy clearly, I pointed out to the claims adjusters and the executives of the company that that was the case, that it's not a minimum and max. They agreed with me in deposition, but for the first time had noticed that day in deposition in Chicago that that was the case. Okay. That's what I was driving at to begin with. I just need to understand your theory. It says that the guaranteed interest rate, it says the initial guarantee interest period, the initial interest rate is 8.3% annually guaranteed for one year. Following this initial guaranteed interest period, we declare that interest rates, which will not be less than the index described below, okay, not less than. And then the index is described as determined each policy anniversary. It's tied to the 10-year bond, U.S. bonds. And it says the index will never be less than 6%, no more than 8.3%. Minimum. Minimum. Okay. So now if we take your reading on the next page and say and read these values, that clause becomes meaningless, what we've just read. Because now what you're saying is he's guaranteed an interest rate minimum, minimum that will generate in year 12 almost $834,000. So it's just that prior page is irrelevant because whether you call it a maximum or a minimum, this is the minimum if we abide your argument. It has to be 100% interest rate. Your Honor, what I was going to tell you is that this policy says two things about what you will get. One is it won't be less than this. And one is that it's guaranteed to be this. So, yes, in effect, this is the guarantee. So what was the purpose of the prior page? I don't know, Your Honor, but if there's an ambiguity, and clearly here at best there's a huge ambiguity. You have to resolve it in favor of the insured who's not sophisticated, who, as Your Honors, are having trouble with this, as I had trouble with this, as North American's own executives had trouble with interpreting their policy. How's Mr. Bjorkman expected to interpret this? When he sees this policy, he put out $55,000, and, yes, the return looks like a lot if you do the math. He testified he didn't do the math. He just saw this. He was promised an excellent rate of return. He was just sort of ---- Well, then how could he have relied on it? I'm sorry? How could he have relied on it? He relied on the facts. This isn't a fraud case. He relied on the fact that this was an excellent rate of return by the broker, yes, and we all agree with that. But when he got his policy, which is the contract ---- How old was he when he got this policy? He's 81 now, Your Honor, so doing the math, I think he was 65 or so. I'm 60. I'll be 64 next July, and I don't consider myself elderly at 64, or I hope not at 65. I agree with you, Your Honor. Certainly the closer I get to that, I agree with you even more. This gentleman did not understand this type of thing. Barely had a high school education, if that, Your Honor. He did not understand the policy. That was clear. But he does understand one thing, one word, and that's guarantee. When you put that word in front of him, he understands that. And then he gets statements every year. Some were consistent with what they say he should have gotten. Others were more consistent with what he thinks he should have gotten. At what point do you start a statute of limitations? If we can address that very quickly, the statute of limitations does not run until there's a breach of contract. Right. So the California ---- let's assume we accept your argument that the California law triggers the obligation to sue, the cause of action accrues when you breach or when they breach. It can't be before that, Your Honor. All right. So let's assume that. Then the question is, does that then mean that that's ---- you want us to just kick it back to the district court now in our contract hearing, go back now and take a look at it and see if ---- in other words, what would be the posture of the litigation at the next phase? You get to proceed with your claim. Isn't there going to be a trial over the ambiguity in the contract, a trial over whether they were reasonable? What's the reasonable interpretation, giving meaning to all words in the contract? Absolutely, Your Honor. That's what you're arguing for. And I think that's the function of a jury. The jury can come in and say, all right, we'll ---- Well, no. A contract interpretation under California law, at least as I understand it, this is California law? I believe so, Your Honor.  Under California law, the contract interpretation is a question for the court. The jury can be impaneled to resolve ambiguities or advise the court in that respect. But at least as I recall California law, there's some role for the court in all this. I believe that's the case, Your Honor. But the jury does resolve factual issues. The jury does determine whether it's reasonable to expect certain things from a contract. I don't think that the court can decide as a matter of law just because it thinks one table is high. We have two very divergent things here in the policy. One says 6 to 8 percent is the minimum. Again, not the maximum. One says you get all this money. I don't think a judge can come in and arbitrarily say, this is unreasonable, so we're giving you this. Well, no, I would never suggest that it should be just an arbitrary decision. And I think that whether you characterize it as arbitrary or not, I think that that's what Judge Stockland has done. Very clearly, I think, from the oral argument from the transcript, she didn't talk about statute of limitations at all. She didn't talk about much of anything other than was it reasonable for him to expect this. I don't think that she can make that determination. I think that clearly there's a question of fact as to whether or not North American breached this contract. And I think there does – certainly you have to have some contract interpretation into this. But you can't say that one is less reasonable than the other when the only thing the policy says other than this guaranteed amount is that this is going to be a range of the minimum, and especially when the company itself didn't understand that until years after they issued this policy and they were sued over it. Counsel, are you saying that we can't interpret the contract at this stage, we have to send it back, or that we can interpret the contract and find your way, that it really meant $800,000 instead of whatever? I don't think you can determine as a matter of law, Your Honor, that it meant $800,000 any more than you can determine that what they are saying is right. I think what you can determine is that it's not proper as a matter of law to say what this contract doesn't say, and that is that he gets $833,000 at the end of 12 years. I don't think it's fair or reasonable for a court to take the place of a jury in this regard and just say this is not reasonable for him to expect this, so we're just going to ignore the guarantee, and we're going to this highly ambiguous language that the company didn't even understand and saying we're going to reform the policy into that, because that's essentially what Judge Stotler has done, notwithstanding that she said she wouldn't reform it. Your Honors, unless you have further questions, I think I will submit based on the evidence process, based on our submissions. Thank you. Reserving some time for rebuttal, if I may. Good afternoon. May it please the Court. Robert Phillips on behalf of Eppley North American. First, with respect to the statute of limitations issue, appellants cited the Bedell v. Celtic case for the proposition that the statute of limitations doesn't begin to run until an insurance company denies a claim. I know Bedell very well. That was my case in front of Judge Breyer up north. Bedell is a very different kind of situation. It is a classic insurance claims case. Ms. Bedell there was seeking benefits for cosmetic surgery. Until her claim for that surgery under health insurance policy was denied, she didn't know what the insurance company's position was. In this case, it's much more like a bank account statement or perhaps an investment account statement. Mr. Bjorklund knew in 1990 what North America's position was with respect to his account values. I understand that you sent him various statements as to what he'd be getting in different amounts various years, and you no longer have any record of what you sent him. Is that right? We don't have hard copies of what we sent him. And that's what the record is below. We are relying on the actual annual statements that he admits receiving which show the correct lower values. And under the Jolly case... I thought he got other statements that said after the first two years or so that it showed about $600,000 and then another time $400,000. He did receive several other statements from my client after 1990 that showed higher amounts as well. But his annual statements that he received, I think at year end, the... Beginning when? Beginning in 1990, put him on notice that at least in those statements, my client was taking the position that his account value was lower. That's not overwhelmingly persuasive, especially in the light of these other statements that he got. With the $400,000 and the $600,000? Or at least the references to that? At a minimum, he was on notice that there was some dispute as to what his amount was, and I believe as of 1996, he had received a statement at that point, and I don't believe he received any confusing ones thereafter. He had received a statement at that point showing the correct lower values. Again, under the statute of limitations analysis, it seems to me that just as you would with a bank account, if you received not only erroneous information based on your initial deposit, but discrepancies in your statements over time, that if you were going to dispute the bank's lower position, position regarding a lower amount, that is when the statute of limitations would begin to run. This is not the time. Kennedy. What would have been the nature of the action? The nature of the action? That he would have filed in, say, 1990 or 1996. If he had not yet demanded money? Correct. And simply why? Which he had not. It would be an action for declaratory relief to determine, either declaratory relief or some other form of equitable relief, to reform the contract to what he would   Now, if you were going to dispute the bank's lower position, it seems to me that just as you would if you had an investment account that you did not want to withdraw because of some penalty or something like that, but you wanted clarification because you thought it was $200,000 higher than your investment company was saying it was. Well, you might wait. If you get every year, you've got a different figure. You might wait for the best figure. And, Your Honor, I think that's sort of what was going on here. He was on notice of my client's position. Well, your client was very confused. I have a hard time seeing when you would have to the statute would start running. And the first time you gave him a statement that showed something, he had to sue right away? And when he then gets another statement that says, well, it's more like what he thought, does that then relieve him of the obligation? No, Your Honor. And he doesn't have to sue when he first receives that initial statement. What California law says, what Jolly said, the California Supreme Court, and what other cases, including the McKelvey case, say, is at that point, when the lower statement comes in, the person is, a reasonable person is at that point in a position where they must investigate. You recall the Jolly case, which involved a real injury. That was a DES case. And the California court, Supreme Court, issued a very harsh ruling in terms of this The rule in the Jolly case was, at a certain point in time, Ms. Jolly had enough information to go investigate. She didn't know necessarily at that point that she had a valid claim, but the information she had gave her enough reason to go investigate. What we're saying here under Jolly is that once Mr. Bjorklund had received two or three statements from my client indicating a lower amount, he at least had a duty at that point to begin some investigation. And what he chose to do was to sit back. Well, that's what he's entitled to do under Romano. The California Supreme Court says if you see an anticipatory breach, you have an election. You can either sue for anticipatory breach, which would be in the nature of a declaratory relief action, or you can sit back and it says, or can treat the repudiation as an empty threat, wait until the time for performance arrives, and exercise his remedies for actual breach if the breach does, in fact, occur at such time. That's when his cause of action occurred. That's a contract case. That's a contract case, but that has to do with repudiation. Isn't that what is the nature of what, under his view, your repudiation, North America is repudiated in its obligation to pay him $844,000 or whatever the higher amount was. They were providing him the actual amount. And then they switched around. So he could reasonably, it seems to me under Romano, say, well, it's not clear what they're going to do, so I'll wait. And then when I demand payment, then, if there's still a problem, we'll resolve it then. But how in the light of Romano are we supposed to pick when the statute started? You're talking about applying a discovery rule, which is normally in a tort context. But when you got Romano, why doesn't that basically govern our analysis here? Because I believe here in this case the tort type analysis should apply. Well, why? I mean, where's the California authority that says it should? How do you square that tort authority with Romano? I believe Romano has to do with the issue of future performance of a contract. Well, that's what this is. At this point, there is an ongoing obligation. At any time, this wasn't where Mr. Romano was waiting until 1999 for some contract to mature. He had a right to surrender that contract at any time. He could have. He could have then put you on the position where actual performance was required. That's what Romano says he can do. He can either say, sue, as you say, for declaratory relief or anticipatory breach, or he can make a demand and require actual performance. And if you then abide, your client abides by its erroneous interpretation, then he's suing you for actual breach. Then the statute clearly would be triggered, because now his cause of action has accrued. Once you ñ once North American declines to pay whatever ñ whether it was in year 4, 5, or 6, the amount on the schedule that he originally had been promised, and he doesn't sue and force it if they don't pay, then the statute's running out. Was it a four-year or a six-year statute? Four-year statute. Your Honor, the only basis ñ When did he file his claim? Filed his claim in 2001. Okay. So you say the statute runs ñ you would put it at least no later than 1996, because that's when it was clear? And that's what Judge Stotler found in her order. The only basis, Your Honor, on which I would distinguish Romano is the fact that here we didn't have a prospect of future performance in this kind of statement of investment account, which is really what this case is about on this issue. There is almost an instantaneous obligation to perform based upon that current account of that. I don't know what the lack of performance is other than giving incorrect information on annual statements. So let's suppose that ñ I mean, you yourself said if he wanted to leave it in, all he could do is bring an action for declaratory relief alleging that there's been an anticipatory breach in his view, not to ñ he wouldn't even be bringing it to reform the contract. In his view, it's a breach. Okay. I think since the red light's gone on, why don't we get to the alternatives? Yes, Your Honor. If I may very ñ If we disagree with you on the statute, how would you suggest you be affirmed, if at all? Judge Stotler found that there was no tribal issue as to whether a clerical error occurred. Following the reasoning in the Simon case, which was a clerical error correction, the other cases we cited in our brief, we were entitled to reform the contract based upon what is, according to the record below, an undisputed clerical error. But the contract was not reformed. My concern is can we ñ can we resolve this issue here at this level, or do we have to send it back to Judge Stotler to entertain the reformation claim, or to make findings with respect to mutual mistake of fact? I believe, given the fact that the record is clear in terms of her order, that she determined that there was no tribal issue, that the policy ñ this is issue 6 ñ policy contained an incorrect table of guaranteed cash values due to an input error, and because she found specifically that plaintiff had suffered no damage because this was a clerical error, that the court ñ that this Court could move on to the decision that she decided she did not need to reach. She said that the reformation issue was moot. Under her findings and under the record that we have in front of us today, reformation under California law is warranted, under the Simon case, which was decided under California law and under other principles. Well, assuming it is warranted, I guess I repeat my question. Can this Court undertake that reformation, or is that something that should be referred back to the trial judge to ñ It's my understanding that because we have this record here with respect to the elements of reformation, and because the Court simply declined to reach that issue, this Court could reach the issue. All right. Thank you, Your Honor. Very briefly, Your Honor, this is not a case for reformation. There was no mutual mistake of fact. What North American is saying is that they made a mistake, so please let us out of that mistake. The mistake was we made a policy that was ambiguous. We had certain guaranteed numbers that were in there that shouldn't have been. Mr. Bjorken did not make a mistake, other than relying on the insurance company's own document to tell him what he was going to get. At no time did Mr. Bjorken testify that he understood that he was to get the lower amount. If he had testified to that, this would be a case of mutual mistake and one for reformation. It is not. As far as the ñ What about the clerical error theory? I'm sorry, Your Honor. Clerical error theory. That's what they say. But I don't think ñ clerical error in the cases that they've cited is when you have parcels of property that are being sold. I think someone was supposed to receive $5,000, and it was recorded as 55,000. Both sides knew it was only supposed to be 5,000. In this case, both sides didn't know it was only supposed to be $100,000 at the end of 12 or actually 13 years. Only the company knew, and they didn't even know until Mr. Bjorken sent a letter to them saying, I want my 833. And they spit it out on a computer that said, no, you only get 125. Is there any evidence other than the policy itself that would be collateral to the negotiations at the time the policy was purchased? There is none, Your Honor, because the insurance ñ we have tried to find the agent. The insurance company testified that they stopped looking for the agent who issued this, who had the conversations with Mr. Bjorken. Mr. Bjorken's memory is not that good. But when ñ just in general, the insurance company testified that they stopped trying to find the agent when they learned from the computer that this is all he gets. That was the end of their investigation. We've cited that in the record. I cited that in my brief. The areas of bad faith that if we ever get that far, we'll get to, that they didn't investigate this. They just said, what's in the computer, that's all we care about. And that's what they told Mr. Bjorken. Sixteen other people received similar policies. Is that right? That's my understanding, Your Honor. Does the evidence show whether they were all from the same agent? Your Honor, they wouldn't let us get into that kind of discovery because we wanted to know the names and addresses of these people to try to find out what happened in those cases. And Judge Scott ñ No, I know you didn't get to the discovery. I wondered whether the record showed whether those 16 policies were sold by the same agent. My ñ I don't think so, Your Honor. But I'm not sure if I really have a basis to say that. Are those complaints ñ they gave you the names of the ones who have filed complaints, the 16? The magistrate issued an order that said we could discover into identities of the 16 only if they filed lawsuits. Okay. And are those lawsuits matters of public record? Presumably, Your Honor, they would. But we didn't have the names of any of these people. And the ñ Excuse me, but do you have those names now? No, we don't. The insurance company refused to give it. The magistrate did not order them to give it. So what you know is that there are 16 lawsuits that have been filed. No, no, no. So what's the summary? I don't know anything about lawsuits. All I know is that they tell me that there were 16 other cases in which the insurance company claimed Scrivener's errors to people that had a similar table like this to Mr. Bjorkman. But the magistrate said you were entitled to know the names of those that had filed  Now, did you ever get that information? That's correct. But the insurance company told us that Mr. Bjorkman's case was the first case in which they noticed it. And so presumably the other cases wouldn't have been ripe or whatever. But we were not given any names of anyone who this happened to who had filed suit. So presumably at that time they had not yet filed suit, if they ever did. Very quickly, the last statement, the erroneous statement, if you will, was not in 1995 or 1996. In 1997, they issued another separate thing that came along with their statement that talked about a much greater amount that Mr. Bjorkman was supposed to get. As far as the statute of limitations. Is that separate thing in the record somewhere? Yes, it is, Your Honor. That's page 772. Okay. Of the excerpts of record. And that's in 1997. As far as the statute of limitations in this discovery rule, whether you talk about tort or contract or whatever you talk about, the discovery rule is not something that makes you have a claim before it starts. It makes you what the discovery rule does is it extends the statute of limitations. It says the statute of limitations would have run on a date back here, but because you didn't discover it until a date in the future, you get to extend that statute of limitations, not you have to sue before the claim. I think we have a pretty good grasp. I think that's right. And I'll submit on that. Thank you very much. Thank you, Your Honor. Thank you both very much. The case just argued will be submitted. The Court will stand in recess for the day.
judges: Reinhardt, O' Scannlain, Fisher